IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ALFRED F. DOWDY, *as Administrator of the*
*Estate of Michael Edward Watson,*

                    Plaintiff,

v.                                      Civil Action No. 3:14-cv-003-JAG

PAMUNKEY REGIONAL JAIL AUTHORITY, *et al.*,

                    Defendants.

## **Memorandum Opinion**

This matter comes before the Court on the defendants' *Motion to Dismiss*. (Dk. No. 2.) The four-count complaint stems from the suicide of Michael Edward Watson, an inmate at the Pamunkey Regional Jail. The plaintiff, as administrator of Watson's estate, alleges state law tort claims and § 1983 claims against the Jail Authority and several of its officials and officers.

The Complaint names eight defendants: the Pamunkey Regional Jail Authority (the "PRJA"); James C. Willet, the Superintendent of the jail; Mary White, the Deputy Superintendent; Mark Claveau, Captain of Security; Michael Berumez, the acting Intake Officer during the events in question; Melinda Workman, an emergency medical technician on duty during Watson's intake; Aaron Garthaffner, a sergeant on duty that same evening; and Jason Allen ("Allen"), a second PRJA officer present during that time.[1]

Count I of the Complaint alleges negligence, gross negligence, and willful and wanton negligence against each defendant. Count II, asserted against the "officer defendants" (those PRJA employees who actually administratively processed, medically screened, and monitored Watson), alleges unconstitutionally deliberate indifference to Watson's medical condition. Count

---

[1] The Court will refer to defendants Willet, White, and Claveau as the "Supervisory Defendants," and defendants Berumez, Workman, Garthaffner, and Allen as the "Officer Defendants."

III alleges institutional and supervisory liability claims under § 1983.  Finally, Count IV asserts a

§ 1983 conspiracy claim.[2]

The defendants have moved to dismiss each Count.  Because sovereign immunity protects

the PRJA and the supervisory defendants, the Court will dismiss Count I as to them.  The other

defendants, however, do not enjoy the complete protection of sovereign immunity, and Count I

will go forward against them, but only as a claim of gross negligence or willful and wanton

conduct.  The Court DENIES the motion to dismiss Count II, a § 1983 claim against the Officer

Defendants, because the allegations state a claim of deliberate indifference.  Count III fails to state

a claim of institutional or supervisory liability, and the Court will GRANT the motion to dismiss

it.  The intra-corporate conspiracy doctrine bars the plaintiff's § 1983 conspiracy claim, and so the

Court GRANTS the motion to dismiss Count IV.

## I. Material Facts

In ruling on a motion to dismiss, the Court must accept the plaintiff's allegations as true,

but not his legal conclusions.  *See De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991).

The Court also need not accept bare-bones factual conclusions.  The complainant must offer more

than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" to

overcome a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v.

Twombly*, 550 U.S. 544, 555 (2007)); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591

F.3d 250, 255–56 (4th Cir. 2009).

Viewed under this standard, the Complaint alleges the following facts:

---

[2] The plaintiff has sued the individual defendants in their official as well as individual capacities.
A suit against a person in his official capacity is actually a suit against the entity for which he
works.  *See Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).  Since the PRJA is a defendant, the
Court will dismiss all the official capacity claims against all the individual defendants as
superfluous.  *See Brissett v. Paul*, 141 F.3d 1157, at *1 (4th Cir. 1998) ("[Naming] the local
governments that employed [the officials] and naming the local officials in their official capacities
was, therefore, redundant and unnecessary.").

On the evening of February 10, 2012, two Hanover County Deputy Sheriffs brought Watson to the jail. The Deputies told the PRJA's acting Intake Officer, Berumez, that Watson had said he wanted to kill himself.[3]  The Deputies also gave Berumez a suicide note written by Watson.  Berumez, Garthaffner, and Allen checked him into the jail and then took him to the Classification Section, where inmates receive medical screening and housing assignments.

Workman, an Emergency Medical Technician in the Classification Section, took charge of Watson at this point.  Despite Workman's alleged awareness of Watson's suicidal intent, Watson received no medical or psychological treatment.  Although the PRJA has individual cells within the jail's infirmary (including two specifically designed for suicide watch), Workman assigned Watson to a standard cell, complete with bed sheets.

Four days later, Watson hanged himself with those bed sheets.  Although the jail took him to a local hospital, Watson died.

An emergency room physician at the hospital later called the jail.  An unidentified person at the jail said that the PRJA did not know of Watson's suicidal tendencies.

## II.  Discussion

### A.  Count I:  Negligence, Gross Negligence, Willful & Wanton Negligence

The motion to dismiss advances a series of objections to Count I, which contains only claims arising under state law.  Only the sovereign immunity defense has any merit.

### 1.  Sovereign Immunity

Both the PRJA and its employees enjoy the protection of sovereign immunity from claims arising under state law.  That protection requires the dismissal of the PRJA and the supervisory defendants, but not of the officer defendants.

---

[3] Although Watson was incarcerated pursuant to some sort of legal order, the Complaint does not make clear whether it was an arrest warrant or an order of conviction.

3

### a. Immunity of PRJA

Under Virginia law, local governments may create "authorities" to perform various local duties.[4]  In this case, several counties and a town have formed the PRJA to operate a regional jail. Although sovereign immunity protects cities and counties to various degrees,[5] this immunity does not carry over to entities they create.  *Jean Moreau & Assocs v. County Health Care Commission*, 283 Va. 128, 140, 720 S.E. 2d 105, 112 (2012).   Instead, to have sovereign immunity, the authority itself must have attributes equivalent to a municipal corporation.   *Carter v. Chesterfield County Health Comm'n*, 259 Va. 588, 590, 527 S.E.2d 783, 784 (2000).

Municipal corporations are entities created to "administer the state's local affairs." *Black's Law Dictionary* 1113 (9th ed. 2010).   Typically, a municipal corporation is an entity "created for political purposes and endowed with political powers to be exercised for the public good in the administration of local civil government." *Id.*   To decide whether an authority has the status of a municipality for immunity purposes, a court must answer two questions:   First, "[h]ow many attributes of a municipal corporation does the entity in dispute possess?" *Hampton Rds. Sanitation Dist. Comm'n v. Smith*, 193 Va. 371, 376, 68 S.E.2d 497, 500 (1952).   Second, what is the entity's function or purpose involved in the case? *Id.*

To have the protection of sovereign immunity, a locally created entity need not have *all* the characteristics of a municipal corporation. *See id.* at 377.   But, in the limited area in which it

---

[4] To name a few, local governments may create electrical authorities, Va. Code §§ 15.2-5400–5431; transportation authorities, Va. Code §§ 15.2-4829–4840, 15.2-6800–6809; water and sewage authorities, Va. Code §§ 15.2-5100–5159; economic development authorities, Va. Code §§ 2.2-2234–2246; behavioral health authorities, Va. Code §§ 37.2-600–615; and industrial development authorities, Va. Code §§ 15.2-4900–4920.

[5] For reasons steeped in nineteenth century legal thought, but unclear to modern humanity, Virginia treats cities and towns differently from counties on sovereign immunity issues.  Counties have absolute immunity from suit; cities and towns are immune only for claims that arise when acting in a "governmental" function. *See City of Richmond v. Long's Admrs*, 17 Grattan 375 (1867) (Operation of public hospital is governmental function, so City was not liable for damage caused by medical negligence).

provides services, the entity must be, in most ways, the equivalent of a local government. "While it is true that the more attributes of a municipal corporation an agency has the more likely it is to be treated as a municipal corporation, the final decision rests on the specific issue of each case." *Id.*

The PRJA possesses many characteristics typical of local governments. It has a quintessentially public purpose: to run a jail. Va. Code § 53.1-95.17. It has a governing body. Va. Code § 53.1-95.6. It may acquire property, appoint officers and employees, make contracts, undertake various projects, accept governmental grants and loans, and sue and be sued. Va. Code § 53.1-95.7. Its officers have arrest powers. Va. Code § 53.1-95.8. It may issue tax-free bonds. Va. Code §§ 53.1-95.10, -95.13. It is exempt from taxation. Va. Code § 53.1-95.15. The State reimburses it for construction and operational costs, and pays part of the salaries of its employees. Va. Code § 53.1-95.19. While Virginia law does not designate a jail authority as a political subdivision, for all intents an authority runs a jail the same way a city, county, or town would. The PRJA has enough characteristics of a municipal corporation to be treated as one for immunity purposes.

Given the PRJA's structure and powers, the Court will treat the PRJA as a municipal corporation for purposes of sovereign immunity. But this decision does not resolve the question of whether the PRJA has immunity for the underlying actions in this case, because the Court must consider the specific function or purpose involved in the case. A municipal corporation, like a city or town, is only immune from suit when it acts in a "governmental," as opposed to a "proprietary" capacity. *See Trans. Inc. v. Falls Church*, 219 Va. 1004, 1005, 254 S.E.2d 62, 63 (1979).

Virginia law offers no rational way to distinguish between governmental and proprietary functions. For instance, the maintenance of streets is a proprietary function, but the maintenance of street lights is a governmental function. *City of Richmond v. Branch*, 205 Va. 424, 428, 137

5

S.E.2d 882, 885 (1964) (routine maintenance of existing streets is a proprietary function); *Falls Church*, 219 Va. at 1005 (maintenance of a stop light is a governmental function).

Fortunately, this case does not require the Court to interpret the hieroglyphic distinctions between governmental and proprietary functions.   The Virginia Supreme Court has clearly held that the operation of a jail is a governmental function, for which a municipal corporation is immune from suit. *Franklin v. Town of Richlands*, 161 Va. 156, 158, 170 S.E. 718, 719 (1933).

Because the PRJA is the equivalent of a municipal corporation, and because it acted in a governmental capacity, it is immune from the state law claims in Count I, and will be dismissed as a defendant in Count I.

### b. The PRJA's Supervisory Officers Are Entitled to Sovereign Immunity

Under Virginia law, another complicated and inconsistent set of rules governs the immunity of individual local officials.   Sovereign immunity can, but does not always, protect employees of local governments. *Messina v. Burden*, 228 Va. 301, 312, 321 S.E.2d 657, 663 (1984).  An employee's immunity derives from the entity for which the employee works, and the employee has sovereign immunity only while performing functions for which the locality itself has immunity. *Id.*  In other words, sovereign immunity can protect employees of counties in any function they perform, because a county has absolute immunity from suit.  Employees of cities, towns, and other local entities, however, only have immunity when performing governmental functions.[6]

Although  the  employee's  immunity  derives  from  his  governmental  employer,  the employee's immunity is not co-extensive with that of his employer. *Messina* articulates a four-

---

[6] This rule of law can lead to absurd inconsistencies.  For instance, a county employee can be immune from liability for work in a county water department, because a county has immunity for all its functions.   In contrast, a neighboring city worker can be sued for his errors in the city's water department, because the operation of a water department is a proprietary function. *Woods v. Town of Marion*, 245 Va. 44, 425 S.E.2d 487, 488 (1993) (water service is a proprietary function).

part test to determine whether the employee is immune. *Messina*, 228 Va. at 301. The Court must consider "(1) the nature of the function performed by the employee, (2) the extent of the state's interest and involvement in that function, (3) the degree of control exercised by the state over the employee, and (4) whether the alleged negligent act involved judgment and discretion." *Id.* (citation omitted).[7]

The final twist in Virginia's immunity law involves the degree of protection afforded local employees. Regardless of whether they work for cities, counties, towns, or other entities, individual employees have immunity only from simple negligence claims. They do not have immunity from intentional torts, or torts involving gross negligence or willful and wanton negligence. *See Colby v. Boyden*, 241 Va. 125, 130, 400 S.E.2d 184, 187 (1991). In essence, individual sovereign immunity requires a plaintiff to plead and prove facts showing an intentional tort or one involving gross or willful and wanton negligence by the employee.

In sum, to determine individual immunity, a court must ask a series of questions: 1) Is the employing entity immune for the function performed by the employee? 2) If the employing entity is immune, does the *Messina* test indicate whether the employee can be immune? 3) If the employee has immunity, has the plaintiff shown only simple negligence? If the court answers "yes" to all three questions, the plaintiff cannot recover from the local employee.

As noted above, the PRJA is the equivalent of a municipal corporation, and operating a jail is a governmental function. Thus, the PRJA's employees work for an immune entity.

The analysis of the four factors in *Messina* is relatively easy here, because they all point toward a finding of immunity. The employees' functions—whether training employees, adopting

---

[7] The same test applies to state employees. *James v. Jane*, 221 Va. 43, 53, 282 S.E.2d, 864 (1980). Like most multipart tests, the immunity analysis provides little guidance to courts. It does not say how much weight to give each factor, opening the door to decisions driven by the individual inclinations of judges. One court might decide that factor 1 is more important than the other factors, while another might give nearly dispositive weight to factor 3.

rules, or handling individual inmates—fall squarely within the arena of government functions. Both the state government (through regulations) and the Authority itself have a great interest in— and control over—the housing of inmates and the proper operation of a jail.[8]

The final, typically dispositive *Messina* factor—whether the employee's actions "involved judgment and discretion"—can be resolved by perusing the substance of the allegations themselves. *Messina*, at 301. The plaintiff cites PRJA rules violated by the officers, but the existence of regulations and guidelines does not answer the question of whether, and to what extent, the employee in question must exercise discretion and judgment in applying those rules and procedures in often uncertain and confused situations. *See Colby*, 241 Va. at 129. The Amended Complaint alleges that the PRJA vested its officers with the authority to assess the physical and mental health of arriving inmates, screen for "dysfunctional" behaviors, personally interview each arriving individual, and make prison housing decisions and assignments based on the officers' subjective determinations as to each inmate's physical and psychological needs and abilities. In short, the PRJA required officers to exercise judgment and discretion in receiving, classifying, and placing incoming inmates. The defendants' actions "were discretionary in nature," entitling those officers to sovereign immunity. *See id.*

Thus, all the individual defendants have sovereign immunity. But, if the plaintiff establishes more than simple negligence, the protection of immunity disappears. *Id.* at 125. Gross negligence "is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another. 'It is a heedless and palpable violation of legal duty respecting the rights of others.' " *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987) (citation

---

[8] The Commonwealth has extensive statutes and regulations that cover the operation of jails. *See, e.g.,* Va. Code §§ 53.1-95.2–95.24 and Va. Code §§ 53.1-68–71, respectively. The plaintiff alleges, additionally, a number of local rules and procedures the PRJA imposes on its officers.

omitted). Willful and wanton conduct involves behavior more egregious than even gross negligence. *Ferguson*, 212 Va. at 92.

The analysis of the immunity of the various individual defendants takes two different paths: one for supervisors, and another for the correctional officers in direct contact with Watson.

### c. The "Supervisory Defendants"—Willet, White and Claveau

The allegations of negligence say that "Defendants, and each of them" behaved negligently by: (1) failing to recognize the severity of Watson's condition, or alternatively, failing to promptly or properly respond; (2) failing to supervise or monitor Watson during his detention; (3) failing to properly segregate Watson; and (4) failing to monitor Watson for signs of suicidal intent. While the Court accepts these factual allegations at face value, it cannot invent facts that the plaintiff does not provide. The plaintiff does not allege that any of the supervisory defendants were present during the time at issue or that any of those defendants were even *aware* of Watson's presence in the jail. The acts or omissions of defendants Willet, White, and Claveau do not begin to approach the standard for gross negligence—conduct "which shows such indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of the [victim]. . . . a degree of negligence as would shock fair minded men . . . ." *Ferguson*, 212 Va. at 92. The Court will dismiss Count I against defendants Willet, White, and Claveau in their individual capacities.

### d. The "Officer Defendants"

The Amended Complaint alleges not only that each of the "officer defendants" *knew* of Watson's suicidal intent upon his arrival at the jail, but also that the very nature of Watson's incarceration order should have impressed upon those officers the need to safeguard Watson from the danger he posed to himself. Despite this, Watson proceeded through the Classification process without receiving either a medical exam or medication, was not assigned to a suicide-watch and

9

observation cell, and was given access to the very sheets that he would later use to hang himself, an act unobserved by PRJA personnel aware of his condition.

The Amended Complaint states a plausible claim for gross negligence against the officer defendants; the Court will accordingly deny the motion to dismiss Count I as to those defendants in their individual capacities. To prevail against those officer defendants, however, the plaintiff must establish gross negligence or wanton and willful conduct.

### 2. Other Arguments in Support of Motion to Dismiss

The defendants raise two other arguments in support of their motion to dismiss Count 1, but neither has merit. First, they argue that the case is barred by Virginia's one-year statute of limitations on suits challenging jail conditions. Va. Code § 8.01-243.2. The one-year limitation, however, addresses only those actions brought by the incarcerated plaintiff or on his behalf. *Id.* Here, the plaintiff is not an inmate, and he asserts a statutory wrongful death action under a separate section of the Code. The intended beneficiaries are not the decedent, but rather his or her statutory beneficiaries. *Kone v. Wilson*, 272 Va. 59, 62, 630 S.E.2d 744, 746 (2006). The limitation in § 8.01-243.2, therefore, does not apply to this suit. Rather, Virginia's two-year limitation for wrongful death claims, Va. Code § 8.01-50, controls this case, and the suit is timely.

Second, the defendants say that Watson's estate should not recover because suicide is a common law crime and, under Virginia law, an individual "who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequence of that act." *Wackwitz v. Roy*, 244 Va. 60, 64, 418 S.E.2d 861, 864 (1992) (internal citation omitted); *Brown v. Harris*, 240 F.3d 383, 386 (4th Cir. 2001) (quoting *Wackwitz*, 244 Va. at 64). To commit the crime of common law suicide, the plaintiff must "be of sound mind." *Harris*, at 386 (citing *Wackwitz*, 244 Va. at 65). The Amended Complaint, however, alleges that Watson was

10

insane at the time of his suicide.  Am. Compl. ¶ 32.  Since Watson was not of sound mind, his death is not a criminal suicide, and the "illegal act" defense fails.

### B. Count II: Deliberate Indifference to Watson's Serious Medical Needs

Count II states a claim of unconstitutionally deliberate indifference to Watson's medical needs.  The defendants assert qualified immunity as a defense to Count II as to the officer defendants.  Because the officer defendants possessed unmistakable evidence of Watson's suicidal intent, and failed to take *any* apparent action to provide Watson with medical attention or protect him from imminent self-harm, those officers are *not* entitled to the protection that qualified immunity affords the well-intentioned mistake-maker.  Further, the officers' actions—taking the plaintiff's allegations at face value—state a plausible claim for deliberate indifference under § 1983.  Count II survives, at least until summary judgment.[9]

### *1. Qualified Immunity*

"[G]overnment officials performing discretionary functions enjoy qualified immunity if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known' at the time of the conduct." *Wheeler v. Gilmore*, 998 F. Supp. 666, 669 (E.D. Va. 1998) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine of qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Chennault v. Mitchell*, 923 F. Supp. 2d. 765, 780 (E.D. Va. 2013) (internal quotation marks omitted) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Determining whether qualified immunity applies requires a three-step approach: the court must (1) identify the statutory or constitutional right alleged, (2) determine whether the right was clearly established at the time of the alleged wrongful action, and (3) then determine whether a

---

[9] Count II seeks recovery against all defendants, but contains allegations only as to the officer defendants.  To the extent Count II seeks recovery against the supervisory defendants or the PRJA, it is dismissed.

reasonable person in the government official's position would have known that his or her actions violated this right. *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990) (Phillips, C.J., concurring); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Court need not address these steps in any particular order. *See Pearson*, 555 U.S. at 236.

### a. Plaintiff Asserts a Clearly Established Right to Adequate Medical Care

Count II alleges that the defendants failed to provide Watson with adequate medical care, failed to protect him from harm, and failed to follow up on his treatment. (Am. Compl. ¶ 60.) At the time of Watson's imprisonment, the Courts had made clear that pre-trial and post-trial inmates have a right to adequate medical care for serious illness. A correctional officer's "deliberate indifference to serious medical needs of [convicted] prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (citation omitted). The Fourth Circuit has held that pre-trial detainees have a right "to medical attention, and prison officials violate a detainee's right to due process [under the Fourteenth Amendment] when they are deliberately indifferent to serious medical needs." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (internal quotations omitted). The courts had clearly and unequivocally recognized these rights at the time of Watson's suicide.

### b. A Reasonable Person Would Have Recognized a Constitutional Violation

This determination must be conducted in light of the information the government official in question possessed at the time. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Where no reasonable officer could believe he was acting in accordance with [a clearly established constitutional right], qualified immunity will not attach." *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995). The government official "should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis included).

Here, the officer defendants knew of Watson's suicidal tendencies: two Hanover County Sheriff's Deputies explicitly told Berumez that Watson had "credibly expressed [a] desire to kill himself;" Berumez possessed two copies of a suicide note written by Watson; and Workman, Garthaffner, and Allen were all allegedly aware of the "threatened suicide." (Am. Compl. ¶¶ 17, 21-23.) At the time of Watson's death, any reasonable officer would have known of the obligation to provide medical care to Watson. The officers are not entitled to qualified immunity.

The officers' knowledge of Watson's suicidal intent—and their subsequent inaction—cannot be disputed. Count II thus states a viable claim for deliberate indifference.

### C. Count III: Supervisory Liability and Institutional Liability

Count III lumps together claims of supervisory liability and municipal liability. Different legal principals govern these two species of liability. An individual § 1983 defendant faces liability only for his personal action or inaction, which can include supervisory action or inaction.[10] In contrast, a local government can only be held liable for its official policies or customs leading to liability.

The Court will, therefore, address the supervisors' individual liability and the PRJA's institutional liability separately.

#### 1. Supervisory Liability

The Fourth Circuit requires a plaintiff asserting a claim of supervisory liability under § 1983 to demonstrate:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged

---

[10] The Court will dismiss Count III as to defendant Workman. The Amended Complaint fails to allege that Workman supervised anyone on February 10 through February 14, or how any supervisory failure of hers endangered Watson. To the extent Count III seeks recovery against any of the other officer defendants, those claims are also dismissed.

13

offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). In the context of this case, to meet *Shaw*'s test, the plaintiff must plausibly allege that the supervisors knew, or should have known, that their subordinates routinely ignored the mental health needs of inmates, and that the supervisor's subsequent response to these offenses—if any—was glaringly insufficient. The plaintiff falls short of meeting his "heavy burden" to allege supervisory liability. *Newbrough v. Piedmont Reg'l Jail Auth.*, 822 F. Supp. 2d 558, 586 (E.D. Va. 2011) (citation omitted).

Nothing in the Amended Complaint intimates that the supervisory defendants knew, or had reason to know, of "pervasive and unreasonable conduct" on the part of their subordinates at the jail. "Misconduct is 'pervasive and unreasonable' if it is 'widespread.'" *Id.* at 587 (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 206 (4th Cir. 2002)). Although the plaintiff does claim a serious breakdown (or neglect of) of the PRJA's procedures for processing and housing a psychologically troubled *individual* from February 10 to 14, a single incident does not even imply that similar breakdowns had occurred previously at the PRJA, or that Jail officers routinely deprived inmates of medical attention (or failed to protect them from harm). A plaintiff cannot satisfy his burden of showing that the supervisor's inadequate response amounted to "deliberate indifference" or "tacit authorization of the offensive practices" by merely "pointing to a single incident or isolated incidents." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984).[11] To meet this burden, the plaintiff must allege and prove the "supervisor's continued inaction in the face of documented widespread abuses." *Id.* The plaintiff has not done so. Allegations that the PRJA

---

[11] The *Slakan* Court explained the reason for this more demanding standard of proof: "A supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* at 373.

14

officers who interacted with Watson infringed upon Watson's constitutional rights may form a basis for a § 1983 action against *those* officers; to implicate their supervisors, however, a plaintiff must allege more than the fact of their organizational status. *See, e.g., Newbrough*, at 586.

### 2. The PRJA's Liability under § 1983

Count III advances two theories of recovery against the PRJA: the plaintiff says that the jail (1) created or accepted a "*policy, custom, or practice*" which acted to deprive prisoners of medical care, and (2) was "deliberately indifferent in *supervising and training*" the officers who allegedly violated Watson's rights. (Am. Compl. ¶ 69.) (emphasis added).

Essentially, these two arguments form a single theory: that the PRJA adopted a custom or policy of deliberate indifference to inmates' medical needs. "[W]here a municipality's *failure to train* its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Newbrough*, at 582 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *Brown v. Mitchell*, 308 F. Supp. 2d 682, 703 (E.D. Va. 2004) ("[A] . . . . failure to train complaint must satisfy the custom and practice requirement.").

The plaintiff's "custom or policy" argument lacks merit. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such failure under § 1983." *Harris*, 489 U.S. at 389 (internal citation omitted). The plaintiff fails to advance any factual allegations to support his claim that the PRJA did not train its staff. Other than the bare conclusion that officers did not receive the appropriate training, the Amended Complaint offers nothing that could plausibly lead to the conclusion that PRJA did not train its officers. Nor does the Amended Complaint allege that the PRJA maintained an "official policy," or adhered to an unofficial "custom," aimed at depriving inmates of medical assistance or protective care. To the contrary, the plaintiff alleges that the

15

PRJA *did* have policies in place to prevent the tragedy that befell Watson, but that the PRJA's officers failed to properly follow or adhere to those policies in *this singular* instance. This allegation falls short of meeting the plaintiff's burden under § 1983.

The Court dismisses Count III in its entirety.

### D. Count IV: Conspiracy to Violate Civil Rights

The plaintiff's final count alleges that each of the defendants (including the PRJA) "acted jointly and in concert" to violate Watson's rights, including an alleged cover-up after Watson's suicide.

Entirely aside from the plaintiff's failure to allege any specific action taken by any specific defendant, Count IV fails under the intracorporate conspiracy doctrine. The Fourth Circuit, in *Buschi v. Kirven*, recognized that:

> It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985) (quoting *Nelson Radio & Supply Co.. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952)). The plaintiff alleges that PRJA officers— "officials of a public body" acting "within the scope of their employment"—conspired with one another. *Id.* at 1252 (internal quotation marks omitted). In this instance, the alleged conspiracy involves only one legally cognizable actor: the PRJA, acting through the decisions and actions of its employees. The plaintiff does not attempt to dispute this characterization in his Response, instead focusing on the separate (and irrelevant) issue of the proper standard of particularity.

Although the plaintiff does not argue the point, the Court notes that the plaintiff's inclusion of each defendant in his or her individual capacity cannot salvage Count IV:

> Nor is the immunity granted under the doctrine to the agents and the corporation destroyed because the agents are sued individually. . . . Simply joining corporate

16

> officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation. The plaintiff must also allege that they acted other than in the normal course of their corporate duties.

*Id.* (internal quotation marks omitted). The Amended Complaint does not allege that the PRJA officers acted in anything "other than . . . the normal course" of their duties. Rather, it alleges only shortcomings and omissions in those employees' performance of their duties—not that they involved themselves in extracurricular, unauthorized activities. The Court dismisses Count IV.

## IV. Conclusion

For the reasons set forth above, the Court DENIES in part and GRANTS in part the defendants' motion to dismiss. The Court DENIES the motion to dismiss Count I as against Officers Berumez, Workman, Garthaffner, and Allen in their individual capacities, but GRANTS the motion to dismiss Count I as to all other defendants. The Court DENIES the motion to dismiss Count II against the Officer Defendants, but grants the motion as to the PRJA and the Supervisory Defendants. The Court GRANTS the motion to dismiss Counts III and IV.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

Date: May 15, 2014
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

17